UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REESE, et al.,

        Plaintiff(s),

v.

MALONE, et al.,

        Defendant(s).

NO. C08-1008MJP

ORDER ON MOTION TO DISMISS

The above-entitled Court, having received and reviewed:

1. Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint (Dkt. No. 92)
2. Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint (Dkt. No. 101)
3. Defendants' Reply in Further Support of Their Motion to Dismiss Consolidated Amended Class Action Complaint (Dkt. No. 112)
4. Defendants' Notice of Supplemental Authority (Dkt. No. 115)

and all attached exhibits and declarations, and having heard oral argument, makes the following ruling:

IT IS ORDERED that the motion is PARTIALLY GRANTED: Defendants BP America, Inc. and Walter Massey are DISMISSED from this action, and Plaintiffs' claim for violations of § 18(a) is DISMISSED as time-barred.

IT IS FURTHER ORDERED that the motion is PARTIALLY DENIED: the Court finds that Plaintiffs have adequately pled 10(b)/10b-5 violations by Defendant BPXA, and adequately pled control person liability pursuant to § 20(a) as regards Defendants BP plc, John Browne, Steven Marshall and Maureen Johnson.

**Background**

**ORD ON MTN
TO DISMISS - 1**

The facts as pled in Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. No. 64) include the following allegations:

In 2001, Coffman Engineering ("Coffman") was hired by the Alaska Department of Environmental Conservation to evaluate a report British Petroleum ("BP") had submitted on preventing corrosion in the oil transport lines ("OTLs"). ¶ 67. Coffman's conclusion was that "BP" had "obfuscated" the data and failed to provide sufficient information to ascertain whether they had an effective program for monitoring corrosion in the lines (a process known as "pigging")[1]. ¶¶ 70-71. Plaintiffs allege that, through "BP's" intervention,[2] the Coffman report was re-written and all the questions about pigging were eliminated. ¶¶ 75-76.

The Complaint goes on to allege a number of facts which it presents as evidence of Defendants' knowledge of the absence of an OTL maintenance program and misrepresentations regarding the corporation's compliance with their own agreements and industry-wide safety practices:

- Defendant Massey received a May 22, 2004 letter from Chuck Hamel (an advocate for BP workers in Alaska) warning of "serious corrosion" and predicting a "major catastrophic event." ¶ 83.
- In September 2005, an internal BP report showed a sevenfold increase in the number of corroded areas and a tenfold increase in the rate of corrosion between 2004 and 2005. ¶ 89. Following a March 2006 spill, Defendant Johnson was quoted by the Associated Press as saying that the September 2005 report revealed a "low manageable corrosion rate." ¶ 147.

---

[1] "Pig" = "Pipeline Integrity Gauge;" there is maintenance "pigging" for cleaning purposes and "smart pigging" for purposes of detecting corrosion and leaks.

[2] The Complaint routinely refers to "BP" without identifying any specific corporate or individual defendant.

**ORD ON MTN**
**TO DISMISS - 2**

- In the wake of the March 2006 spill, it was reported in August 2006 (on MSNBC.com and in the *Financial Times*) that BP had not pigged the OTL in the Eastern Operating Area line ("EOA") since 1992 and had not pigged the Western line ("WOA," the line where the March 2006 spill occurred) since 1998. (Plaintiffs contrast this to the practices of Alyeska, which pigs its trans-Alaska pipeline every two weeks.) ¶¶ 86-87.

- On May 14, 2006, Defendant Johnson had told *Petroleum News:* "You can count on us to not only do the reactive things we've done already: the inspections, the additional inhibitor, maintenance things, the smart pigging..." ¶ 153.

- Defendant Marshall made statements to *Bloomberg News* that "corrosion caused by a chemical additive [was] involved in the two main theories of why the spill occurred," a statement Plaintiffs label as "false and misleading" for misrepresenting chemical additives as the "unexpected" cause of the corrosion in the OTLs. ¶ 155.

- On April 25, 2006, Defendant Browne reported in a press conference that the March 2006 leak had occurred despite "the fact that we have both world class corrosion monitoring and leak detection systems, both being applied within regulations set by the Alaskan authorities." ¶ 160.

- A Corrective Action Order ("CAO") was issued by Pipeline and Hazardous Materials Safety Administration ("PHMSA") following the March 2006 spill. ¶ 91. One of the requirements was that the EOA be "smart-pigged" by June 15. ¶ 97. BP failed to do that. Only after PHMSA issued a followup warning on July 20 did BP smart-pig the EOA line (on July 22, 2006). ¶ 100.

- Plaintiffs allege that Defendant Johnson's statement (quoted in *Petroleum News* on May 14, 2006) that "[w]e've looked at all of the oil transit lines. . . none other has the

same combination of factors [as the WOA line]" was false in light of the CAO's language that the pipelines were "similar." ¶ 96, ¶ 91.

- Plaintiffs cite as a "false statement" the 2005 Annual Report (issued on June 30, 2006) which stated that "BP is in discussion with PHMSA on assuring compliance with the corrective actions outline in the [CAO]." ¶ 162. Plaintiffs claims this is a misrepresentation based on BP's failure to pig the OTL until July 22.

The results of the July 22 pigging caused BP to send visual inspectors out to the lines on August 5 and 6, and to shut down the line on August 6. ¶¶ 104-106. The Complaint alleges that, as a result of the announcement of the shutdown of Prudhoe Bay on August 6, 2007, the price of BP's ordinary shares and American Depositary Receipts ("ADRs") fell 13 pence and $2.09, respectively. ¶ 183. On October 24, 2007, BP Exploration (Alaska) Inc. pled guilty to a criminal violation of the Clean Water Act and paid a $20 million fine for the acts leading up to and the damage caused by the 2006 spills. ¶ 124. The plea agreement representing the acknowledgement of guilt contained admissions that the defendant knew of the corrosion which caused the leaks and failed to properly inspect, monitor and maintain the pipelines. ¶ 126.

Plaintiffs filed this proposed shareholder class action against corporate Defendants BP plc, BP Exploration (Alaska) Inc. (BPXA), BP America Inc., and individual Defendants John Browne (former CEO of BP plc), Steve Marshall (former President of BPXA), Maureen Johnson (former Senior Vice-President of BPXA) and Walter Massey (former director and head of the Board of Directors environmental committee for BPXA). The putative class is comprised of "all those who purchased or otherwise acquired ordinary shares and ADRs of BP plc between March 31, 2005 and August 4, 2006, inclusive, and who were damaged thereby." ¶ 170.

## Discussion

### I. FRCP 12(b) Standard - Failure to State a Claim

The Court is mindful that, in considering the question of whether this complaint states a claim upon which relief may be granted, the Court must (1) accept as true all material allegations in the complaint; (2) make all reasonable inferences to be drawn from those allegations; and (3) construe the allegations in the light most favorable to the plaintiffs. NL Industries, Inc. v. Kaplan, 792 F.2d 869, 898 (9th Cir. 1986). A complaint will not be dismissed if the plaintiffs can prove any set of facts to support a claim that would merit relief. Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965-1969 (2007); Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-338 (9th Cir. 1996).

### II. Heightened Pleading Standards - Fraud and the PSLRA

The federal rules of pleading require that, in any allegation of fraud, the plaintiff must state with particularity the circumstances constituting the fraud. FRCP 9(b). Where the claims concern securities fraud, the claimant must satisfy the even more stringent standards established by the Private Securities Litigation Reform Act ("PSLRA").

The PSLRA mandates that, in any private action in which the plaintiff alleges that a defendant made an untrue statement of material fact or omitted to state a material fact, the complaint must:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1). The plaintiff must attribute the misleading statements upon which the claim is based to a particular defendant. Further, the PSLRA states that:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged. . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

**ORD ON MTN TO DISMISS - 5**

15 U.S.C. §78u-4(b)(2). Failure to satisfy the PSLRA's heightened pleading standard requires dismissal of the complaint. 15 U.S.C. §78u-4(b)(3)(A).

**III.     Liability Under § 10(b)/10b-5**

To plead securities fraud under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 of the SEC (17 C.F.R. § 240.10b-5), the plaintiff must allege, in connection with the purchase or sale of securities: (1) a misstatement or omission of fact (2) made with scienter (i.e., intent to defraud) (3) on which plaintiff relied (4) which proximately caused the complained-of damages. Dura Pharms, Inc. v. Broudo, 544 US. 336, 341-342 (2005).

1. Actionable misrepresentations or omissions

The parties make frequent reference to this Court's prior ruling in an earlier, similar matter: In re BP Prudhoe Bay Royalty Trust Sec. Litig., 2007 WL 3171435 (W.D.Wash. Oct. 26, 2007)("PBRT").  The Court rejects any attempt by either side to use this previous opinion as a "shortcut" through sound legal analysis and citation to the record in this matter.  While there are some commonalities between these two cases, there are considerable differences as well; sufficiently so that the rationale in this order is beholden only in limited measure to the PBRT ruling.  The parties' arguments in the instant case (and Plaintiffs' Complaint) must stand or fall on their own merits.

There is, however, at least one "artifact" from PBRT which survives to play a role in this matter.  The Court finds that the quarterly filings with the Securities and Exchange Commission ("SEC") made in connection with BPXA's obligations under the PBRT contract throughout the purported Class Period (which included documents wherein Defendants represented that they were in compliance with Alaska's Prudent Operator Standard),[3] may be utilized by Plaintiffs as evidence of

---

[3] "Section 7.1 Prudent Operator Standard. Grantor [BPXA] agrees. . . that it will conduct and carry on the development, exploration, production, maintenance and operation of the Subject Interest with reasonable and prudent business judgment, in accordance with the provisions of this Article Seven and good oil and gas field practices, as a reasonable and prudent operator. . ." ¶ 134.

**ORD ON MTN
TO DISMISS - 6**

false or misleading statements upon which any investor was permitted to rely. A statement is false if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists," (Brody v. Transitional Hospitals Corp., 250 F.3d 997, 1006 (9th Cir. 2002)), and that is not a principle Defendants can evade by arguing that this is simply private contractual language. The Court is likewise cognizant of the "duty to speak" which arises whenever a defendant must "state a material fact necessary in order to make the statements made. . . not misleading." In re Connectics Corp. Sec. Litig., 542 F.Supp.2d 996, 1009 (N.D.Cal. 2008).

Had this commitment to abide by the Prudent Operator Standard simply been a contractual provision between BPXA and the PBRT shareholders, Defendants might have argued convincingly regarding its relevance and/or admissibility, but the filing of the agreement as a public document in compliance with SEC requirements renders it a representation that investors may rightly rely upon; in this case, a representation that, by Defendants' own admission, BPXA knew to be untrue.

The remainder of Plaintiffs' allegations intended to establish Defendants' fraudulent conduct do not fare as well. Challenged by Defendants to meet the heightened specificity standards of the PSLRA, Plaintiffs cite the following statements for their "affirmative falsity" along with the reasons why they are actionably misleading:

1. *Defendant Johnson's statement that the WOA pipeline was "unique;" alleged to be misleading because PHMSA had already determined that other pipelines were "similar."*
   The Court does not find this to be a false statement, primarily because a review of the Complaint reveals that it does not allege that Johnson said the pipeline was "unique" – Defendant Johnson is quoted as saying "the highly corrosive conditions were unique to that line" (¶ 149; emphasis added), not that the pipelines were themselves dissimilar.

2. *Defendant Johnson's statement (referring to the OTLs) that "none other has the same combination of factors;" alleged to be misleading based on PHMSA's finding that there was a danger of additional spills because of the similarity between the leaking line and other lines.* The Court finds nothing actionably false about this vague and ambiguous statement. Plaintiffs nowhere allege that Johnson stated there was no danger of spills in any of the other lines. The Court agrees with Defendants that just because the lines were of similar design, construction, composition, etc. does not mean that the combination of factors which produced a leak in one OTL could not be a one-time confluence of events, which is the gist of Johnson's statement here. Plaintiffs' pleadings do not establish that such a statement was false.

3. *Defendant Johnson's May 14, 2006 statement that "you can count on us to do not only [what] we've already done. . . the smart pigging."* The Court finds that, as pled in Plaintiffs' Complaint, there is nothing actionably fraudulent about this statement. (It is presented in both Plaintiff's Complaint and pleadings out of context; i.e., there is no time frame presented for the statement "[what] we've already done.") The <u>implication</u> is that the company had been smart pigging all along, which was certainly not true; the pleadings are insufficient to determine if Johnson actually claimed that. Based on the information presented to the Court, since Defendants <u>had</u> smart-pigged at some point (in the 1990s), it is not an inaccurate or false statement to say that they had "already" done so.

4. *Defendant Browne's July 25 statement that BP was "accelerating pigging;" alleged to be false because PHMSA had already had to issue a followup directive based on BP's failure to comply with the original deadlines of the CAO.* It is true that PHMSA had been forced to re-order BP to comply with its original directive; but (as Plaintiffs themselves point out) BP had finally complied on July 22, 2006, making the July 25 statement not inaccurate or false.

**ORD ON MTN
TO DISMISS - 8**

5. *Defendant Johnson's statement that the September 2005 inspection had revealed a "low manageable corrosion rate;" alleged to be false because the results of that report showed a "sharp and rapid spike in the corrosion rate."* There is no inherent contradiction in these two statements – a sharp and rapid spike in the corrosion rate could still produce "low, manageable" corrosion, and Plaintiffs' Complaint contains no expert opinions to the contrary.

6. *Defendant Marshall's statement that the spill was the result of "corrosion caused by a chemical additive;" alleged to be false because the plea agreement resulting from the criminal charges against BP contained an admission that "both leaks in substantial part" resulted from Microbial Induced Corrosion ("MIC") with no reference to "chemical additives."* Plaintiffs misstate the allegation as pled in their Complaint, which reads "Marshall said corrosion caused by chemical additive [was] involved in two main *theories* of why the spill occurred." (¶ 155; emphasis supplied)  The fact that Defendants later determined that these theories were incorrect and that MIC was the cause of the spill does not make this statement false.

7. *Defendant Browne's statement (at a press conference in April 2006 addressing first quarter 2006 results) that BP had a "world class corrosion monitoring system;" alleged to be false because no pigging had been conducted.*  Defendants claim that there are other methods of monitoring corrosion besides pigging, and the Complaint does not plead that pigging was the only means of corrosion monitoring; nor does the statement claim that Defendants had been using the system.[4]

---

[4] Johnson actually goes on to say that BP's "world class corrosion monitoring and leak detection systems [were] being applied within regulations set by the Alaskan authorities." As both parties acknowledged at oral argument, BPXA's non-pigging practice did not violate any statutes or regulations, rendering Johnson's "being applied" statement essentially meaningless.

**ORD ON MTN TO DISMISS - 9**

8. *Defendant said, in its June 30, 2006 Annual Report for 2005, that "it was assuring compliance with the corrective actions outlined in the [March 15, 2006] order;" alleged to be false because BP had failed to comply with the CAO by failing to smart pig the EOA lines in the time period set in the order.* Plaintiffs have taken this statement out of context in an attempt to create the impression that it is sufficiently deceptive to satisfy the pleading standards. The full statement – that BPXA was "<u>in discussion with PHMSA on</u> assuring compliance with the corrective actions outlined in the order" (emphasis supplied) – is not actionable because Plaintiffs do not allege that Defendants were not in discussions with PHMSA at the time the report issued.

9. *Defendant Browne stated on July 25, 2006 that BP was cooperating to the "fullest possible extent" and "doing more;" alleged to be false because BP was violating the CAO by failing to smart pig and therefore was not "cooperating" and "doing more."* "Cooperating" and "doing more" are vague and general terms, incapable of precise definition and difficult to disprove; Plaintiffs do not allege or offer proof that Defendants were actually not "cooperating" or "doing more;" it is merely a conclusory allegation. In fact, by July 25, BP had begun complying with the CAO.

None of the statements attributed to Defendants satisfies the heightened pleading standards of the PSLRA. Plaintiffs also list a series of omissions which they repeat throughout the Complaint as a boilerplate allegation intended to demonstrate the false, misleading nature of Defendants' statements: the OTLs were under-inspected and maintained, corrosion maintenance had been severely curtailed, Defendants had been warned that the pipelines were severely corroded, Defendants had been warned of the necessity of pigging and taken no corrective action, and Defendants suppressed evidence of

corrosion rather than addressing the problem (see ¶¶ 136, 148, 150, 156, 161,167).[5] Plaintiffs' conclusory allegations that Defendants were aware of the existence of a corrosion problem do not make any of the statements they attribute to Defendants deceptive at the level required by the PSLRA. Plaintiffs' Complaint does not connect the list of omissions to the challenged statements or show how the facts about Defendants' mismanagement of their pipelines render the statements misleading. The chronicle of omissions and negligent care amount to corporate mismanagement on a massive scale, but that does not make them actionable as securities fraud.

The Court finds that Plaintiffs have not asserted sufficient facts to justify retaining any of the Defendants in this lawsuit except BPXA on the basis of 10(b)/10b-5 liability (but see § 20(a) control person liability *infra*). This Court has previously found that BPXA was not operating pursuant to the Prudent Operator Standard and had "knowingly refused to implement corrective measures." In re PBRT, 2007 WL 3171435, at *4. Rule 10b-5 covers any untrue statement. Based on the SEC filings containing representations of their compliance with the Prudent Operator Standard, Plaintiffs have adequately pled fraudulent or misleading statements by BPXA and Defendants are not entitled to dismissal pursuant to FRCP 12.

None of the statements attributed to the remaining Defendants are sufficient to satisfy the pleading standards of federal civil procedure or the PSLRA. The statements of Defendants Browne, Johnson and Marshall have been discussed *supra*. Defendant Massey is not alleged to have said anything, and the case for retaining him in this litigation is especially weak. Plaintiffs argue that the spills themselves were the communication of his deceptive acts, which became known to the public when it was disclosed that the spills were the result of corrosion of which he was warned by the Hamel letter in 2004. Setting aside that none of these allegations appear in the Complaint, Plaintiffs' novel

---

[5] In fact, these allegations uniformly read that "BP" was responsible for all this malfeasance; since "BP" is not a defendant in this action, Plaintiffs' pleadings repeatedly violate the requirement that the alleged fraud be attributed to a specific defendant.

**ORD ON MTN**
**TO DISMISS - 11**

argument is supported by neither statutory nor legal authority, any more than their argument that investors were "deceived" by Massey on the basis of their reliance on his "good faith" as head of the environmental committee of the Board of Directors. There is simply no legal justification for Defendant Massey's presence in this lawsuit.

Plaintiffs argue that Massey and BP America, Inc. (which is also not alleged to have communicated anything to investors) are liable on a theory of "scheme liability," a concept which is endorsed by the Supreme Court (see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S.Ct. 761 (2008)) but which requires some allegation that the "deceptive conduct" of these Defendants was actually relied upon by investors. Id. at 769. Plaintiffs have not adequately pled investor reliance or "scheme liability" regarding these two Defendants. Plaintiffs claim that Count I of the Complaint pleads "scheme liability" against all the Defendants (Opposition, p. 27), but, as reliance by investors on the complained-of acts is not adequately alleged against any of them, the argument is no more successful than against Massey and BP America, Inc..

2. Scienter

Having found that securities fraud has not been adequately pled against any other Defendants, this order will only address the issue of scienter as it applies to Defendant BPXA.

In that regard, this Court finds no need to look any further than the plea agreement which BPXA executed to find sufficient evidence of scienter: a "strong inference that the defendant acted with the required state of mind," (15 U.S.C. § 78u-4(b)(2) which is defined as "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n.12 (1976); "deliberate recklessness." In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 974 (9th Cir. 1999).

The plea agreement contains the following admissions by BPXA:

> BPXA believed that internal corrosion on the OTLs was a low probability. However, production upsets allow water and sediment to leave the separation facility and enter the OTL which increases the likelihood of internal corrosion in a low velocity line such as the OTL. BPXA was aware by 2004 that production upsets were occurring frequently as a result of processing heavier, more viscous oil at gather Center 2 (GC2). BPXA knew that the EOA OTL also had sediment collecting in the pipe. . . BPXA was aware of sediment build up on the EOA OTL prior to both spills.
> *****
> BPXA knew that it had insufficient inspection data on the EOA OTL. BPXA failed in light of these conditions to take necessary action to prevent the leaks on the OTLs. BPXA failed to clean the OTLs with a piece of equipment called a maintenance (or cleaning) pig and inspect the pipe for corrosion activity with a smart pig.

BPXA Plea Agreement, Dkt. No. 116, Ex. A, pp. 10-11.

As alleged in Plaintiffs' Complaint and reflected in the plea agreement, BPXA knew the EOA line had sediment collecting in the pipe prior to both spills, was aware (by 2005) of increased corrosion activity in the OTLs that leaked, failed to pig the lines adequately and did not expend sufficient resources to address the corrosion issue in the OTLs. ¶ 126. The Court has no difficulty finding, against the background of this knowledge, that the BPXA's representation (via their public SEC filings) that their operation of the OTLs was consonant with the Prudent Operator Standard was misleading to a "deliberately reckless" degree. The element of scienter is adequately pled as regards this defendant.

3. Loss causation

Loss causation need not be pled with particularity. In the 9th Circuit, 12(b)(6) dismissal is not appropriate as "long as the complaint alleges facts that, if taken as true, plausibly establish loss causation. . . enough facts to raise a reasonable expectation that discovery will reveal evidence of loss causation." In re Gilead Sciences Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008).

The Complaint alleges that, in the wake of the announcement of the Prudhoe Bay shutdown on August 6, 2006, the price of BP's ADRs dropped $2.09 share. Defendants attempt to paint this as such a low percentage drop as to be *de minimis*. Plaintiffs point out that, with more than 3 billion

shares outstanding, the decline represents a $6+ billion market capitalization loss. The Court denies Defendants' motion to dismiss as regards Plaintiffs' allegation of loss causation.

**IV. §18(a) claims and statute of limitations**

§ 18(a) provides an express right of action for a false or misleading statement contained in a document filed with the SEC; the elements are: "(1) a misrepresentation or omission (2) of a material fact (3) contained in an SEC filing (4) upon which the plaintiff relied in the purchase of a security." In re Redback Networks, Inc., 2007 WL 963958, at *6 (N.D.Cal. Mar. 30, 2007).

Defendants attack this claim on two fronts: First, as they argue at length in the rest of their briefing, that Plaintiffs have not adequately alleged a false or misleading statement sufficient to satisfy the pleading requirements of FRCP 9 or the PSLRA. In keeping with the above analysis, the Court agrees as to all Defendants except BPXA.

Defendants also argue that the claim is time-barred: a § 18(a) claim must be brought within one year after the discovery of the facts constituting the cause of action. 15 U.S.C. § 78r(c). Based on Plaintiffs' allegation of August 7, 2006 (the announcement of the Prudhoe Bay shutdown) as the "date of discovery" (¶ 183), the filing of the Complaint on November 15, 2007 and the addition of the § 18(a) claim on February 29, 2008, Defendants contend that Plaintiffs are well outside the expiration of the one-year period.

Plaintiffs respond that the Sarbanes-Oxley Act (28 U.S.C. § 1658) extended the statute of limitations to two years for § 18 claims, and cite a number of unpublished, non-precedential district court opinions in support of that contention. Teachers' Ret. Sys of La. v. Qwest Comm. Int'l, 2005 WL 2359311, at *3 (D.Colo. Sept. 23, 2005); In re Adelphia Comm. Corp. Sec. & Derivative Litig., 2005 WL 1675940, at *4 (S.D.N.Y. July 18, 2005); In re Stone & Webster, Inc. Sec. Litig., 2006 WL 1738348, at *3 n. 1 (D.Mass. June 23, 2006).

Defendants cite opposing cases, however (see In re Alstom SA, 206 F.Supp.2d 402, 420 (S.D.N.Y. 2005)), and it is clear that there is (1) a split in authority on this issue, and (2) no Ninth Circuit precedent at all. This Court finds the Alstom rationale more persuasive on the following grounds: (1) the extended limitations period applies only to causes of action concerning fraud claims and therefore to claims which require the pleading of fraudulent intent or scienter; and (2) nothing in the language or history of Sarbanes-Oxley indicates a clear intent to overrule express limitations period, and § 18 contains just such an express limitations period. Id. Because § 18(a) does not meet either of these conditions (a scienter component or the absence of an express limitation period), Plaintiffs' § 18(a) claims are barred by the statute of limitations.

**V. § 20(a) control person liability**

A prima facie case for control person liability under § 20(a) must plead (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003). As the Court observed in PBRT,

> [w]hether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. Id. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

2007 WL 3171435, at *8 (W.D.Wash. Oct. 26, 2007). Plaintiffs are not required to demonstrate actual participation by Defendants or the exercise of power in order to establish derivative liability under § 20(a) (No. 84 Employer-Teamster, 320 F.3d at 945), and general allegations concerning an individual's title and responsibilities are sufficient at the pleading stage. See In re Adaptive Broadband Sec. Litig., 2002 WL 989478, at *19 (N.D.Cal. Apr. 2, 2002); In re Cylink Sec. Litig., 178 F.Supp.2d 1077, 1089 (N.D.Cal. 2001).

As indicated *supra*, a primary violation of federal securities law has been adequately alleged. The Complaint does not allege sufficient facts to sustain control person liability for Defendant Massey, stating only that he was a "non-executive member of the BP plc board of directors" from 1998 to 2008 and served on the Ethics and Environment Assurance Committee. ¶ 27. These allegations do not speak to any degree of control over the operations of the corporation and certainly no involvement in its day-to-day activities.

The remainder of the individual defendants, however, are alleged to have sufficient involvement in corporate operations to sustain a finding that control person liability has been sufficiently pled. Browne (as CEO of BP plc) and Marshall (as President of BPXA) occupied traditional positions of control and spoke publicly on behalf of their organizations. ¶¶ 28, 75, 117, 119, 155-56, 179, 195. Johnson was a Senior Vice President of BPXA during the Class Period; perhaps more significantly (in light of the Court's findings regarding the relevance of BPXA's SEC filings), the Complaint alleges that Johnson was responsible for information provided by BPXA to the public. ¶ 29.

Regarding the corporate defendants, the motion to dismiss the § 20(a) claim against BP America will be granted. The only allegations contained in the Complaint concerning this business entity are that BPXA was a subsidiary of BP America (¶ 25) and the conclusory allegation that "BP America acted as a controlling person of BPXA within the meaning of Section 20(a) of the Exchange Act." ¶ 197. This is not sufficient.

Control person liability is adequately pled for Defendant BP plc, however. The Complaint contains allegations that BPXA was a wholly-owned subsidiary of BP plc, which exercised control, oversaw BPXA's operations, made decisions about maintenance and production and issued press releases on their behalf. ¶¶ 23, 25, 160-69. These allegations are sufficient to support the inference that the above-named defendants controlled operations at BPXA and thus survive a motion to dismiss,

recognizing that these defendants will be permitted to develop the nature of Plaintiffs' proof through discovery and interpose defenses of good faith or lack of participation at a later date.

**Conclusion**

Plaintiffs' § 18(a) claims are barred by the statute of limitations and will be dismissed in their entirety. Liability for Defendant Massey and Defendant BP America has not been adequately pled, either as primary violators of 10(b)/10b-5 or under a control person liability theory, and the motion to dismiss those defendants from the lawsuit will be granted.

Primary 10(b)/10b-5 liability has been sufficiently pled against one defendant, BPXA; the motion to dismiss the 10(b)/10b-5 cause of action against the remaining defendants will be granted. But the Court finds that § 20(a) control person liability has been adequately alleged as to the remainder of the defendants (BP plc, Browne, Johnson and Marshall), and the motion to dismiss that claim against them will be denied.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: February _27_, 2009

Marsha J. Pechman
U.S. District Judge